IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RAINBOW HEALTH CARE CENTER, INC., an Oklahoma Corporation ) ) ) Plaintiff, ) ) v. ) ) ) ) JAMES MICHAEL CRUTCHER, ) acting in his official capacity as the ) COMMISSIONER OF THE OKLAHOMA ) STATE DEPARTMENT OF HEALTH, ) ) Defendant. ) | | No. 07-CV-194-JHP |

## ORDER AND OPINION

Before the Court are Plaintiff's Motion for Summary Judgment [Docket No.40], Defendant's Response in Opposition [Docket No. 41], and Plaintiff's Reply to the Response [Docket No. 43]. Also before the Court are Defendant's Cross-Motion for Summary Judgment [Docket No. 39], Plaintiff's Response in Opposition [Docket No. 42], and Defendant's Reply to the Response [Docket No. 44]. For the reasons set forth below, Plaintiff's Motion is GRANTED, and Defendant's Motion is DENIED.

## BACKGROUND

Plaintiff Rainbow Healthcare Center, Inc. ("Rainbow") is a licensed nursing home located in Bristow, Oklahoma. As a pre-condition to admission, Rainbow requires its residents to sign an admission agreement that sets forth various terms and conditions. Included in its agreement is an arbitration provision which provides that all disputes between Rainbow and its residents are subject

1

to binding arbitration. The agreement allows for residents to opt out of the arbitration provision provided they do so within 10 days of the signing of the agreement. The agreement provides that the arbitration provisions are governed by the Federal Arbitration Act ("FAA").

Rainbow has been told by the Oklahoma State Department of Health ("OSDH") that its arbitration provision violates Oklahoma's Nursing Home Care Act. Okla. Stat. tit. 63, § 1-1900.1 *et. seq.* Section 1-1939(E) of the Act provides that a nursing home resident can not waive his or her right to a jury trial in an action brought pursuant to the Act.[1] OSDH claims Rainbow's arbitration agreement amounts to a waiver of residents' right to a jury trial in violation of § 1-1939(E). OSDH has threatened to revoke Rainbow's license to operate its nursing home unless Rainbow removes the arbitration provision from its resident admission agreements.

Rainbow filed the instant lawsuit on April 3, 2007, seeking a declaration that § 1-1939 is preempted by the FAA and an injunction permanently enjoining OSDH from enforcing § 1-1939 against Rainbow. Rainbow subsequently filed motions seeking both a temporary restraining order and a preliminary injunction [Docket Nos. 6, 10]. The motions were referred to a magistrate who held a hearing on the motions and then issued a Report and Recommendation [Docket No. 17] recommending the denial of the motions. This Court subsequently entered an order adopting the Report and Recommendation and denying the motions [Docket No. 20]. After an October 25, 2007, scheduling conference at which the parties agreed there were no disputed material facts, the Court requested the parties submit cross-motions for summary judgment. Those motions were filed on November 30, 2007.

---

[1] "Any party to an action brought under this section shall be entitled to a trial by jury and any waiver of the right to a trial by a jury, whether oral or in writing, prior to the commencement of an action, shall be null and void, and without legal force or effect." Okla. Stat. tit. 63, § 1-1939(E).

In its motion, Rainbow claims the FAA preempts the Nursing Home Care Act's prohibition of jury waivers. The FAA provides that an arbitration provision in "a contract evidencing a transaction involving commerce" shall be enforceable, except under such grounds that exist at law or in equity for the revocation of *any* contract. 9 U.S.C. § 2. Rainbow argues that because § 1-1939 only applies to nursing home admission agreements—and not *all* contracts—it is preempted by the FAA so long as Rainbow's admission agreement is "a contract evidencing a transaction involving commerce."

OSDH[2] argues the FAA does not apply to Rainbow's admission agreement because the operation of a nursing home facility is a purely intrastate activity. OSDH further argues that even if the FAA would otherwise apply to nursing home admissions agreements, Congress has enacted subsequent legislation removing such agreements from the FAA's coverage. OSDH argues that because the FAA does not preempt § 1-1939, Rainbow is bound to comply with § 1-1939 and must remove the arbitration provision from its admission agreement.

The dispositive question of law presented by the motions is whether the FAA preempts Okla. Stat. tit. 63 § 1-1939.

## **DISCUSSION**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v.*

---

[2] James Michael Crutcher, in his official capacity as Commissioner of the OSDH, is the named plaintiff. The Court, however, will refer to the OSDH as the plaintiff throughout this opinion.

*Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

**A. The Conflicting Statutes**

The FAA provides that arbitration agreements in contracts involving interstate commerce are presumptively valid:

> A written provision in any . . . contract *evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added). The FAA further defines "commerce" to include "commerce among the several States." 9 U.S.C. § 1. In enacting the FAA, "Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984). Congress has thus mandated the enforcement of arbitration agreements, subject to two limitations: 1) they must be part of a written maritime contract or a contract "evidencing a transaction involving commerce," and 2) such clauses may be revoked upon "grounds as exist at law or in equity for the revocation of any contract." *Id.* at 10-11 (quoting 9 U.S.C. § 2).

The Oklahoma statute in question provides that waivers of the right to trial in nursing home agreements are presumptively *invalid*:

> Any party to an action brought under this section shall be entitled to a trial by jury and any waiver of the right to a trial by a jury, whether oral or in writing, prior to the commencement of an action, shall be null and void, and without legal force or effect.

Okla. Stat. tit. 63 § 1-1939(E). The Oklahoma statute thus invalidates arbitration agreements in a specific type of contracts—those involving nursing home care. Therefore, the second limitation on the reach of the FAA does not apply, but so long as the FAA applies to the commercial activity in question—nursing home care—it appears to be in direct conflict with Okla. Stat. tit. 63 § 1-1939(E). The question, therefore, is whether Rainbow's admission agreement is a contract "evidencing a transaction involving commerce."

**B. Interstate Nexus**

The Supreme Court has interpreted the term "involving commerce" in the FAA as the functional equivalent of the more familiar term "affecting commerce"—a term which signals Congress's intent to invoke the broadest permissible exercise of its Commerce Clause power. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). That broad power "may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice ... subject to federal control... and that general practice...bear[s] on interstate commerce in a substantial way." *Id.* at 56-57. (internal citations omitted)(quotations omitted).

The breadth of Congress's Commerce Clause power was first fully realized in *Wickard v. Filburn*, 317 U.S. 111 (1942). In *Wickard*, the Supreme Court took the then extraordinary step of holding that the Commerce Clause gave Congress the power to regulate the intrastate act of a farmer growing a small amount of wheat for the farmer's own table. *Id.* at 127-28. The Court reasoned that by growing wheat for his own table, the farmer was able to refrain from purchasing wheat at market. *Id.* The Court noted that, while taken alone, the farmer's actions might not have a substantial economic effect on interstate commerce, the farmer's actions were nationally significant in their

cumulative effect, by altering supply-and-demand relationships in the interstate wheat market. *Id.*

Some twenty-two years later, in *Katzenbach v. McClung*, 379 U.S. 294 (1964), Congress re-examined and re-affirmed the broad Commerce Clause power first realized in *Wickard*. In *Katzenbach*, the Supreme Court recognized Congress's power to exercise Commerce Clause power to regulate purely local business establishments purchasing substantial quantities of goods that had moved in interstate commerce. Factually, the case involved a family-owned restaurant in Birmingham, Alabama that did business only at that single location. The restaurant annually bought about $70,000 worth of meat from a local supplier who procured the meat from out of state. The Court, recognizing there was no claim that interstate travelers ate at the restaurant, and recognizing the restaurant itself conducted no business with any out of state person or entity, nonetheless concluded that Congress could validly exercise Commerce Clause power to prevent racial discrimination at the restaurant. *Id.* at 298-299, 305. As the Court put it, the only relevant question was "whether the particular restaurant...serves food a substantial portion of which has moved in interstate commerce." *Id.* at 304.

Some thirty-nine years later, in deciding *Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 56 (2003), the Supreme Court applied the broad Commerce Clause power recognized in *Wickard* and *Katzenbach* in the specific context of the FAA. In *Citizens Bank*, the Supreme Court was asked to determine whether a loan agreement between an Alabama bank and an Alabama construction company evidenced "interstate commerce" as defined by the FAA. *Id.* at 56. Recognizing the construction company secured the loans with its inventory of goods—some of which were obtained from out of state—the Court answered in the affirmative, reasoning:

> If the Commerce Clause gives Congress the power to regulate local business establishments purchasing substantial quantities of goods that have moved in

> interstate commerce, *Katzenbach v. McClung*, 379 U.S. 294, 304-305, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), it necessarily reaches substantial commercial loan transactions secured by such goods.

*Id.* at 57. The Court, therefore, clearly determined that the Commerce Clause power exercised by Congress through the FAA was co-extensive with the broad Commerce Clause power recognized in *Wickard* and *Katzenbach. See id.* at 56 ("The term 'involving commerce' in the FAA [i]s the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power").

Read together, *Wickard, Katzenbach* and *Citizens Bank* stand for the proposition that the FAA reaches the broadest amount of commercial activity allowed by the Constitution—which can include a local business buying supplies from a company procuring those supplies from out of state. Although OSDH argues that *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000) somehow limit the Commerce Clause power exercised by Congress in this case, those cases are not relevant to the case at bar. Both *Lopez* and *Morrison* dealt with Congress's attempts to use its Commerce Clause power to regulate *non-economic* activity. The case before the Court involves activity—contracting for goods and services—that is undoubtedly economic, and is in no way analogous to the regulation of guns near schools and violent crimes against women involved in *Lopez* and *Morrison*. In fact, the *Citizens Bank* Court pointedly noted that its recent decision in *United States v. Lopez*, 514 U.S. 549 (1995), "did not restrict the reach of the FAA...indeed, we did not discuss that case in *Lopez.* Nor did *Lopez* purport to announce a new rule governing Congress's Commerce Clause power over concededly economic activity such as the debt-restructuring agreements before us now." *Id*. at 58. Therefore, the Court rejects OSDH's contention that *Lopez* and *Morrison* somehow limit the reach of the FAA in this case. The Court thus

examines the economic activity at issue to see if it falls within the broadest permissible reach of Congress's Commerce Clause power.

In the present case, Rainbow is best characterized as a business providing certain goods and services to its customers for a fee. OSDH is certainly correct that the nursing care provided by Rainbow occurs wholly within the state of Oklahoma. OSDH, however, views the goods and services provided by Rainbow too narrowly. When a person chooses Rainbow as the provider of his or her nursing home care, that person is entering into an agreement with Rainbow by which Rainbow is to provide to that person, food, medicine, shelter, and medical care among other things.[3] The food, medicine, and durable medical supplies provided and used by Rainbow must come from somewhere. In this case, Rainbow purchases the food it provides from Ben E. Keith, a Texas company that supplies food products procured from numerous states and foreign countries. Rainbow purchases its medicines—at least in part—from Omnicare, Inc., a Kentucky company that in turn procures its drugs from various other states. Rainbow purchases its durable medical supplies—at least in part—from Tidewater Group Purchasing, a Maryland company that in turn procures its medical supplies from various other states.

In all, about one quarter of Rainbow's expenditures for goods and services can be traced to

---

[3] Having failed to comply with LcvR 56.1(c):

> The response brief in opposition to a motion for summary judgment . . . shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exists. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's fact that is disputed. *All material facts set forth in the statement of material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.*

(Emphasis added), OSDH is deemed to have admitted all factual allegations set forth in Rainbow's statement of material facts. (Pl.'s Mot. at 3-12.)

interstate transactions.[4] Standing alone, these purchases of goods—all of which are necessary predicates to the providing of nursing home care—which have moved in interstate commerce is enough to classify Rainbow's nursing home care as "interstate commerce" as contemplated by the *Katzenbach* Court. Therefore, considering the *Citizens Bank* Court's determination that the FAA reaches as much commercial activity as is constitutionally permissible, this Court must conclude the admission agreement in question evidences a transaction involving interstate commerce.

Although the Court is convinced those activities alone establish the requisite interstate nexus, Rainbow presents significant additional evidence illustrating how its admission agreements involve interstate commerce. For example, when a prospective resident from out-of-state applies for admission, Rainbow sometimes sends personnel out-of-state to meet the applicant and perform an assessment to determine whether Rainbow will enter into an admission agreement with the applicant. At other times Rainbow will review medical records and reports submitted by the out-of-state applicant's physician and hospital, and may contact those people by telephone to obtain additional information. Rainbow also sometimes accepts resident admissions from out-of-state. In the instances where Rainbow decides to enter into an admission agreement with an out-of-state applicant, Rainbow sends the admission agreement across state lines to be filled out by the applicant. Rainbow also receives payments for some of its out-of-state patients from across state lines. Each of these activities illustrate how the admission agreements in question undoubtedly evidence a transaction involving interstate commerce.

The Court recognizes the Oklahoma Supreme Court's decision in *Bruner v. Timberland*

---

[4] In 2006, Rainbow expended a total of $401,308.19 on goods and services from out of state vendors. That amount constituted 23.66% of all expenditures made by Rainbow on goods and services (excluding salaries and wages). (Pl.'s Mot. at 12.)

*Manor Limited Partnership*, 155 P.3d 16 (Okla. 2006), but finds it distinguishable from the case at hand. In *Bruner,* the Oklahoma Supreme Court held that an arbitration provision in a nursing home admission agreement was not governed by the FAA and was unenforceable under §1-1939. The court's holding, however, was based on the fact the parties selected Oklahoma law to govern the arbitration provisions. The court noted that the arbitration agreement "does not mention the FAA," but that "in at least eight different places, provide[s] that arbitration shall be governed by Oklahoma law." *Id.* at 30. The *Bruner* court's holding was therefore predicated on the choice-of-law provision contained within the agreement: "Where, as here, Oklahoma law is the choice of law set out in the arbitration agreement, enforcement of the parties' agreement under Oklahoma law is fully consistent with the goals of the FAA. This is so even if the result is that arbitration will not go forward under Oklahoma law and even though the FAA would otherwise permit it to go forward." *Id.* By contrast, the arbitration clause contained within Rainbow's agreement specifically provides that the agreement "shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. §1-16." [Docket No. 40-3 at 8.] Thus, the rationale upon which the *Bruner* court based its holding is inapplicable to the facts set forth in this matter.

The *Bruner* court concluded in dicta that the execution of a nursing home admission contract is a local transaction:

> the evidence of interstate commerce in this case demonstrates a *de minimus* impact on interstate commerce. The facts that the nursing home buys supplies from out-of-state vendors rather than in-state vendors and uses internet and long distance telephone lines do not demonstrate a substantial impact on interstate commerce and are insufficient to impress interstate commerce regulation upon the admission contract for residential care between the Oklahoma nursing home and the Oklahoma resident patient.

*Id.* at 31. However, to the extent the *Bruner* court held that buying supplies from out of state vendors

did not constitute interstate commerce, this Court cannot reach a similar conclusion. When applying Supreme Court precedent like *Katzenbach*—which delineate the broadest possible reach of Congress's Commerce Clause power—this Court must conclude that the care and services provided by Rainbow to its residents affect interstate commerce in a substantial way.

In reaching its conclusion that the nursing home in question was not engaged in interstate commerce, the *Bruner* court also focused on whether the receipt of Medicare payments constituted interstate commerce—concluding they did not. In the present case, this Court reaches its holding independent of any examination of Medicare or Medicaid payments made to Rainbow. Therefore, the *Bruner* court's reasoning in that regard is inapplicable to the case at hand.

Having concluded that the admissions agreements in question evidence a transaction involving interstate commerce, the agreements are governed by the FAA unless Congress has evidenced an intent to withdraw such admissions agreements from the coverage of the FAA.

## C. Congressional Intent

While the FAA presumptively governs all agreements evidencing a transaction involving interstate commerce, Congress can selectively preempt the FAA by enacting subsequent laws either explicitly preempting, or wholly inconsistent with, the FAA:"If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history...or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) (citation omitted.) Here, OSDH argues that 42 U.S.C. § 1396a, 42 U.S.C. § 1396r(c)(5)(A)(iii) and/or 42 C.F.R. § 483.75—all regulations imposed on states by the federal government as a precondition to receiving Medicaid funding—preempts the FAA and excludes nursing home

11

admissions agreements from the FAA's coverage.

### 1. 42 U.S.C. § 1396a

42 U.S.C. § 1396a requires states to adopt a qualified "State Plan" that has been approved by the Secretary of Health and Human Services. One of the required elements of the State Plan is that the state establish and maintain "health standards for private and public institutions in which recipients of medical assistance under the plan may receive care or services." 42 U.S.C. § 1396a(a)(9). Additionally, the State Plan must comply with the federal requirements for nursing home facilities, 42 U.S.C. § 1396a(a)(28), and proved a mechanism to determine such compliance. 42 U.S.C. § 1396a(a)(33).

OSDH argues that 42 U.S.C. § 1396a's requirement that Oklahoma establish and maintain health standards for nursing homes as a prerequisite to receiving Medicaid funds establishes Congress's intent to allow states to prohibit arbitration agreements in nursing home admissions agreements. Despite OSDH's argument that "it is clear that Congress effectively and intentionally abrogated the applicability of the FAA to nursing home regulation when it enacted Title 42, Section 1396," nothing in the text of § 1396a amounts to an explicit Congressional directive prohibiting arbitration agreements in this context, nor does OSDH point to a single provision of the text, legislative history, or purpose of § 1396a which supports its interpretation of the statute. The statute simply does not address the validity of arbitration agreements.

In the absence of such an explicit provision, the only remaining question is whether there is an "inherent conflict between arbitration and the statute's underlying purposes."OSDH has failed to demonstrate the existence of such an inherent conflict and cites no authority for the proposition that the enforcement of non-mandatory arbitration agreements is in inherent conflict with § 1396a's

requirement that Oklahoma establish and maintain "health standards" for its nursing homes. OSDH argues at length that arbitration agreements negatively impact patient care, but this argument simply perpetuates the historical prejudice against arbitration agreements that Congress sought to eradicate when it enacted the FAA some 80 years ago. *See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford,* 489 U.S. 468, 474 (1989). OSDH's argument is seemingly that Congress, having required Oklahoma to establish standards for its nursing homes as a precondition to receiving Medicaid funding, gave Oklahoma a statutory "blank check" authorizing it to enact whatever rules and regulations it wishes, even those in conflict with preexisting federal law. Such reasoning is flawed and not supported by any reported case law.

OSDH has simply presented no evidencing proving that Congress intended for 42 U.S.C. § 1396a to preempt the FAA by allowing states to exclude nursing home admissions agreements from its coverage.

**2. 42 U.S.C. § 1396r(c)(5)(A)(iii)**

42 U.S.C. § 1396r(c)(5)(A)(iii) prohibits nursing homes receiving federal funds from demanding any consideration as a precondition to admitting Medicaid eligible residents:

> in the case of an individual who is entitled to medical assistance for nursing facility services, not charge, solicit, accept, or receive, in addition to any amount otherwise required to be paid under the State plan under this subchapter, any gift, money, donation, or other consideration as a precondition of admitting (or expediting the admission of) the individual to the facility or as a requirement for the individual's continued stay in the facility.

Rainbow's arbitration agreement, however, is not mandatory. In fact, under Rainbow's admissions agreement, the resident has the unilateral right to revoke the provision for up to 10 days after signing the agreement. Therefore, it is clear that Rainbow does not force its arbitration agreement upon its residents as a prerequisite to their entering and staying at Rainbow's facility. Thus, 42 U.S.C. §

1396r(c)(5)(A)(iii) does not evidence Congressional intent to preclude nursing home admissions agreements containing non-mandatory arbitration agreements from the FAA's coverage.

### 3. 42 C.F.R. § 483.75

42 C.F.R. § 483.75 is part of a group of federal regulations for long-term care facilities and provides that such a facility "must be licensed under applicable State and local law" in order to participate in Medicaid.[5] OSDH argues that because licensure by the state of Oklahoma requires compliance with the Nursing Home Care Act—including its prohibition on waivers of the right to a jury trial—42 C.F.R. § 483.75 exhibits Congress's intent to preclude the FAA from preempting state laws like the Nursing Home Care Act.

OSDH's argument fails in several respects. First, 42 C.F.R. § 483.75 cannot be read to require compliance with state and local laws that are invalid, illegal, or otherwise preempted. Under OSDH's rationale, the state of Oklahoma could enact a statute denying nursing home licenses to a protected class of nursing home operators, and then simply argue that any federal statute or constitutional provision pre-dating § 483.75 that would invalidate the suspect Oklahoma law was preempted by § 483.75. Such a reading of § 483.75 is clearly illogical. Certainly a nursing home must comply with state licensing requirements before it can participate in Medicaid, but it must only comply with state requirements that are valid under federal law.[6]

Therefore, 42 C.F.R. § 483.75 does not evidence Congressional intent to preclude nursing

---

[5] A similar statute governs Medicare disbursments: a nursing facility must be "licensed under applicable State and local law" to be eligible. 42 U.S.C. § 1395i-3(d)(2)(A).

[6] Here, Rainbow's position is that the FAA preempts Oklahoma's state law prohibiting arbitration agreements in nursing home admission agreements. Should this Court agree with Rainbow, the Oklahoma law would be preempted and Oklahoma could no longer require compliance with the law as a precondition to licensure. Rainbow would then presumably be in full compliance with Oklahoma's licensing requirements and would be eligible to participate in Medicaid.

home admission agreements from the FAA's coverage.

## CONCLUSION

Despite the myriad of arguments presented by the parties in their cross-motions, this case can be resolved with the resolution of two issues: (1) whether Rainbow's admission agreement evidences a transaction involving interstate commerce, and (2) if so, whether Congress has enacted any laws withdrawing Rainbow's admission agreement from the FAA's coverage. Having determined Rainbow's admission agreement evidences a transaction involving interstate commerce, and having determined that Congress has not withdrawn Rainbow's admission agreement from the FAA's coverage, the Court must conclude that Okla. Stat. tit. 63, § 1-1939(E)'s prohibition of arbitration agreements in nursing home admission agreements is preempted by the FAA. In enacting the FAA, Congress expressed a national policy favoring enforcement of arbitration agreements, and there is nothing to suggest that Congress ever intended to carve out an exception to that broad policy allowing the state of Oklahoma to *disfavor* arbitration agreements in nursing home admission agreements.

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is GRANTED, and Defendant is permanently enjoined from enforcing Okla. Stat. tit. 63, § 1-1939(E) against Plaintiff.

IT IS SO ORDERED.

James H. Payne
United States District Judge
Northern District of Oklahoma